## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,     )
                           )
     Plaintiff,           )
                           )     CIVIL ACTION NO: __1:19-CV-724__
         v.          )
                           )
HYUNDAI CONSTRUCTION EQUIPMENT  )
AMERICAS, INC.               )
                           )
And                         )
                           )
HYUNDAI HEAVY INDUSTRIES CO., LTD.  )
                           )
     Defendants.         )

## COMPLAINT

The United States of America, by authority of the Attorney General and at the request of

the Administrator of the United States Environmental Protection Agency (EPA), files this

Complaint and alleges as follows:

## NATURE OF ACTION

1.  This is a civil action for civil penalties under the Clean Air Act (the Act), 42 U.S.C. §§ 7401-

7671, arising from Defendants, Hyundai Construction Equipment Americas, Inc. ("HCEA")

and Hyundai Heavy Industries Co., Ltd. ("HHI", collectively with HCEA, "Hyundai"),

importing, selling, offering for sale, and/or introducing into commerce certain nonroad

compression-ignition engines in heavy construction equipment that were neither covered by

the certificates of conformity required under Section 203(a)(1) of the Act, 42 U.S.C.

§ 7522(a)(1), nor exempt from that certification requirement. Manufacturers must obtain a

certificate of conformity valid for the model year of an engine that demonstrates the engine

1

complies with applicable emission standards for that model year.  Equipment introduced into commerce in the calendar year (or after) in which new emissions standards become effective must contain engines certified to the new standards or that are otherwise exempt from such certification requirements.  But Defendants pre-purchased, or "stockpiled," thousands of engines meeting older emissions standards in the years before those standards changed for the purpose of evading the newly applicable, more stringent emissions standards.  They then imported, sold, offered for sale, and/or introduced into commerce equipment containing these uncertified, non-compliant engines in violation of the Act.  In addition, hundreds of additional units of equipment that Defendants imported, sold, offered for sale, and/or introduced or delivered into commerce failed to meet the Transition Program for Equipment Manufacturers (TPEM) program regulations.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Sections 204 and 205 of the Act, 42 U.S.C. §§ 7523 and 7524.

3.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1395 and Section 205 of the Act, 42 U.S.C. § 7524.

## DEFENDANTS

4.    HHI is a publicly-traded company headquartered in Ulsan, South Korea.

5.    HHI is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e).

6.    HHI is a "manufacturer" within the meaning of Section 216(1) of the Act, 42 U.S.C. § 7550(1).

7.   At all times relevant to this action, HHI's Construction Equipment division was devoted to manufacturing and sale of heavy construction engines and equipment, and through that division, HHI was engaged in the business of manufacturing, importing, offering for sale, selling, and/or introducing or delivering for introduction into commerce heavy construction equipment powered by nonroad compression-ignition engines.

8.   In November of 2012, HHI submitted a notice of its intent to use the TPEM program to import certain engines in calendar year 2012.

9.   HHI is subject to the jurisdiction of the courts of the United States for this action pursuant to 40 C.F.R. § 1039.626(a)(7).

10.   HCEA is incorporated under the laws of the State of Illinois, and has its principal place of business at 6100 Atlantic Blvd., Norcross, GA 30071.

11.   HCEA is a wholly-owned subsidiary of HHI.

12.   HCEA is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e).

13.   HCEA is a "manufacturer" within the meaning of Section 216(1) of the Act, 42 U.S.C. § 7550(1).

14.   At all times relevant to this action, HCEA was engaged in the business of importing, offering for sale, selling, and/or introducing or delivering for introduction into commerce heavy construction equipment powered by nonroad compression-ignition engines.

## STATUTORY AND REGULATORY BACKGROUND

15.   This action arises under Title II of the Act, as amended, 42 U.S.C. § 7521, *et seq.*, and the regulations promulgated thereunder relating to exhaust emissions standards for nonroad compression-ignition engines.

Congressional Findings, Purposes, and Mandates

16.   In enacting the Clean Air Act, Congress found that "the growth in the amount and complexity of air pollution . . . has resulted in mounting dangers to the public health and welfare . . . ." 42 U.S.C. § 7401(a)(2).

17.   Through the Act, Congress intended "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population[.]" 42 U.S.C. § 7401(b)(1).

18.   The Act requires EPA to prescribe and revise standards applicable to the emission of any air pollutant from new motor vehicles or new motor vehicle engines, and nonroad vehicles or nonroad engines that, in EPA's judgment, causes or contributes to air pollution which may reasonably be anticipated to endanger public health or welfare. 42 U.S.C. §§ 7521(a)(1), 7547(a).

19.   Enforcement of the emission standards for nonroad engines and nonroad vehicles occurs in the same manner as enforcement of emission standards for new motor vehicles or new motor vehicle engines. 42 U.S.C. § 7547(d).

Certificates of Conformity

20.   Section 203(a)(1) of the Act, 42 U.S.C. § 7522(a)(1) prohibits manufacturers of nonroad equipment using compression-ignition engines from importing, selling, offering for sale, introducing or delivering for introduction into commerce (or causing any of the foregoing with respect to) any equipment unless the engine contained therein is covered by a certificate of conformity issued by EPA under regulations prescribed by the Act. See 42 U.S.C. § 7547(d), (making Section 203 of the Act applicable to nonroad compression-ignition engines.)

21.  The certification process allows EPA to ensure that every nonroad compression ignition engine introduced into commerce satisfies applicable emission standards.

22.  To obtain a certificate of conformity, an engine manufacturer must submit an application for a certificate of conformity to EPA for each nonroad engine family and each model year that it intends to manufacture the engine family for introduction into commerce. The certificate of conformity application must include, among other things, identification of the covered engine family, a description of the nonroad engines and their emission control system, and test results from a test engine or engines showing that the engine family satisfies applicable emissions standards. 40 C.F.R. §§ 1039.201; 1039.205.

23.  If, after review of the certificate of conformity application and other information, EPA determines that the test engine or engines described in the certificate of conformity application meet(s) the requirements of the Act, EPA will issue a certificate of conformity for the nonroad engine family for that model year. 40 C.F.R. § 1039.255.

24.  The provisions of 40 C.F.R. part 1068 apply to land-based nonroad compression-ignition engines that are subject to the provisions of 40 C.F.R. part 1039.  40 C.F.R. § 1068.1(a)(6).

25.  Manufacturers of nonroad equipment may not sell, offer for sale, or introduce or deliver into commerce in the United States or import into the United States any new engine/equipment after emission standards take effect for the engine/equipment, unless it is covered by a valid certificate of conformity for its model year. 40 C.F.R. § 1068.101(a)(1). A valid certificate of conformity is one that applies to the same model year as the model year of the equipment (except as allowed by § 1068.105(a)), and is effective for no more than one year. § 1068(a)(1)(i).

The Tier 4 Emissions Standards

26.   EPA has promulgated, and from time to time revised, emissions standards for nonroad compression-ignition engines. See 40 C.F.R. Parts 89 and 1039. These standards are referred to with a "Tier" designation.

27.   In 2004, EPA adopted more stringent standards (referred to as "Tier 4 standards") intended for use in nonroad equipment using compression-ignition engines to achieve significant reductions in particulate matter, nitrogen oxides, and sulfur oxides. To meet Tier 4 standards, equipment manufacturers across power categories generally must modify their equipment designs to accommodate engines with additional and improved emissions control devices. 69 Fed. Reg. 38,958 (June 29, 2004) (codified at 40 C.F.R. Part 1039); *see also* 40 C.F.R. §§ 1039.101, 1068.101(a)(1).

28.   Tier 4 standards were set in two phases, Tier 4i (or interim) and Tier 4f (or final). As relevant here, Tier 4i became effective for engines with power between 56 and 130kW on January 1, 2012. 40 C.F.R. § 1039.102, Tables 4 and 5. Tier 4f became effective for these engines on January 1, 2015. 40 C.F.R. § 1039.101, Table 1. Tier 4f became effective for engines with power between 19 and 56 kW on January 1, 2013 and for engines with power between 130 and 560 kW on January 1, 2014.  40 C.F.R. § 1039.102, Tables 2 and 6.

29.   Equipment introduced into commerce in the calendar year (or after) in which Tier 4 standards became effective must contain engines certified to the new Tier 4 standards or that are otherwise exempt from such certification requirements.

30.   Equipment manufacturers may also "continue to use up normal inventories of engines that were built before" Tier 4 standards became effective. 40 C.F.R. §§ 1068.101(a), 1068.105(a).

The TPEM Program

31.  EPA adopted transition provisions for equipment manufacturers to provide

flexibility for these manufacturers to selectively delay compliance with the Tier 4 standards for

up to seven years, within certain limitations. This program is referred to as the Transition

Program for Equipment Manufacturers (TPEM). 40 C.F.R. § 1039.625.

32.  Equipment manufacturers may continue to introduce into commerce in the United

States limited numbers of nonroad equipment with "exempt" engines that have been certified to a

less stringent emissions standard after the Tier 4 emissions standards have taken effect if they

comply with all the TPEM requirements. 40 C.F.R. § 1039.625.  Thus, under the TPEM

program, manufacturers may continue to introduce into commerce equipment with engines that

would otherwise be uncertified.

33.  Equipment manufacturers may comply with TPEM based on a percent of their

production allowance, or a maximum number of exempted pieces of equipment (small volume

allowance) and may choose either option for a particular power category. 40 C.F.R. §

1039.625(b)(1)-(2).

34.  Under the percent-of-production allowance, equipment manufacturers are permitted

to produce equipment with exempted engines up to a limit placed on the percentage of total sales

within a power category relative to its total U.S.-directed production volume. Under the percent-

of-production allowance, the sum of these annual percentages within a power category during the

seven-year period may not exceed 80 percent. 40 C.F.R. § 1039.625(b)(1).

35.  Under the small-volume provision, equipment manufacturers are allowed to

determine an alternate allowance for a specific number of exempted engines using one of the

following approaches for its U.S.-directed production volumes: (1) they may have produced up

to 700 units with exempted engines in a power category during the seven-year period, with no more than 200 units per power category in a single year. Engines within a power category that are exempted under this approach must be from a single engine family within a given year; or (2) for engines below 130 kW, equipment manufacturers may have produced up to 525 units with exempted engines within a power category during the seven-year period, with no more than 150 units in a power category per year, and produce up to 350 units for exempted engines at or above 130 kW in a power category during the seven-year period, and no more than 100 units in a power category per year. Under this approach, exemptions may apply to engines from multiple engine families in a given year. 40 C.F.R. § 1039.625(b)(2).

36.   Before a manufacturer may begin using the TPEM program, it must notify EPA of its intent to do so and provide information about its intended use of TPEM exemptions, including an estimate of the number of units in each power category it plans to produce and whether it intends to use the percent-of-production or small volume approach. 40 C.F.R. § 1039.625(g).

37.   An engine that is purportedly exempt from the Act's certification requirement under the TPEM program is not in fact exempt if the engine manufacturer fails to comply with the detailed TPEM regulations.  40 C.F.R. § 1039.625.

38.   After the equipment manufacturer has used up its TPEM exempted engine quota, under either the percent-of-production or the small volume approach, any additional equipment that it sells, offers for sale, introduces or delivers into commerce, and that contains engines that were not certified to currently applicable standards will violate the prohibition of 42 U.S.C. § 7522(a)(1) and 40 C.F.R. § 1068.101(a)(1).

Existing Inventory Engines and Stockpiling

39.  After the Tier 4 standards are effective, equipment manufacturers may "continue to use up normal inventories of engines that were built before" Tier 4 standards became effective. 40 C.F.R. §§ 1068.101(a), 1068.105(a).

40.  Equipment manufacturers who introduce into commerce equipment containing uncertified engines built before new standards are in effect that were not part of normal inventories are liable for violations of 42 U.S.C. § 7522(a)(1) and 40 C.F.R. § 1068.101.

41.  Equipment manufacturers are specifically prohibited from circumventing the certification requirement by stockpiling engines that were built before Tier 4 standards took effect.  40 C.F.R. §§ 1068.101(a), 1068.105(a).

42.  For purposes of the TPEM program, normal inventory engines under 40 C.F.R. § 1068.105(a) are considered compliant engines (even though they may not have the same emission controls) and are not included in the equipment manufacturer's TPEM allowances. 40 C.F.R. § 1039.625(d)(1).

Enforcement Mechanisms

43.  The U.S. Department of Justice has authority to bring this action on behalf of the EPA Administrator under 28 U.S.C. §§ 516 and 519 and Sections 205(b) and 305(a) of the Act, 42 U.S.C. §§ 7524(b) and 7605(a).

44.  Section 205(b) of the Act, 42 U.S.C. § 7524(b), authorizes the EPA Administrator to bring a civil action to assess and recover civil penalties for violations of Section 203(a)(1) of the Act, 42 U.S.C. § 7522(a)(1).

45.  Section 205(a) of the Act, 42 U.S.C. § 7524(a), authorizes civil penalties of up to $25,000 per day for each violation of Section 203(a)(1) of the Act, 42 U.S.C. § 7522(a)(1).

46. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101–410, 104 Stat. 890 (codified as amended at 28 U.S.C. § 2461 note), EPA increased the amount of civil penalties to $37,500 per day for each violation of Section 203(a)(1) of the Act, 42 U.S.C. § 7522(a)(1), that occurs on and after January 13, 2009 and through November 2, 2015. 40 C.F.R. § 19.4 (2016).

## CRIMINAL ENFORCEMENT

47. On September 28, 2018, the United States filed a separate criminal case, in the form of a Criminal Information, against Defendant HCEA in the United States District Court for the Northern District of Georgia. Case No. 1:18-CR-00379.

48. The United States alleged that, in violation of 18 U.S.C. § 371, HCEA conspired to a) defraud the United States for the purpose of impeding, impairing, obstructing, and defeating lawful government functions of the EPA, to wit, implementing and enforcing vehicle emissions standards under the Clean Air Act and b) violate the Clean Air Act, by making and causing to be made, false material statements, representations, and certifications in, and omitting and causing to be omitted material information from, notices, applications, records, reports, plans, and other documents required pursuant to the Clean Air Act to be filed and maintained, in violation of 42 U.S.C. § 7413(c)(2)(A).

49. On November 14, 2018, HCEA pled guilty to the charges alleged in the Criminal Information.

50. As part of its plea agreement, HCEA specifically admitted that the United States would have been able to prove beyond a reasonable doubt that:

      a.     In June and July 2013, a consultant that HCEA had hired to assist HCEA with the TPEM regulations told HCEA that HHI was in violation of the TPEM regulations and

10

strongly recommended that HCEA not import any additional Tier 3 or TPEM engines. The consultant told an HCEA employee that the violation could result in a penalty of over $13 million.

      b.     HCEA disregarded the consultant's advice and instead continued importing and selling equipment, including equipment with TPEM engines in excess of the regulatory allowance.

      c.     HCEA violated the Clean Air Act regulations by importing more Tier 3 engines than allowed by the Clean Air Act regulations.

      d.     HCEA violated the Clean Air Act regulations by importing more TPEM engines than allowed by the Clean Air Act regulations.

      e.     HCEA violated the Clean Air Act regulations by filing at least one annual report with false material information and intentionally omitting material information.

      f.     On or about Jun 15, 2013, HCEA's North American Sales Manager sent an email to multiple HCEA and HHI employees suggesting a strategy to fraudulently avoid detection by the EPA of violations of the TPEM regulations.

      g.     On or about June 21, 2013, an HHI employee evaluated and documented potential fines for violations of the TPEM regulations, finding the civil penalties could range from $29 million to $67 million.

      h.     In or about the summer of 2013, the President of HCEA authorized the import by HCEA of 17 pieces of equipment after having been informed that importing that equipment would violate the TPEM regulations. The 17 pieces of equipment were subsequently imported into the United States and sold.

i.    On or about October 10, 2013, the North American Sales Manager of HCEA sent an email to certain employees of HHI noting that the 2012 annual TPEM report to the EPA was incorrect and that if they had to lie in the future, they would need to have a logical explanation for their decisions in the future.

j.    On or about March 31, 2014, the North American Sales Manager for HCEA submitted the 2013 annual TPEM report to the EPA, which contained materially false information and omitted material information.

51. The United States and HCEA jointly recommended that the Court impose a sentence requiring HCEA to pay to the United States a criminal fine of $1,950,000 pursuant to 18 U.S.C. § 3571(d).

## GENERAL ALLEGATIONS

52. HHI manufactured and sold to HCEA heavy construction nonroad vehicles containing compression ignition engines between January 1, 2012 and December 31, 2015 that were not compliant with current-year emissions standards or were not imported in compliance with the TPEM program.

53. The engines that HHI installed in many of these units were purchased in advance as part of one or more "pre-buying" program(s) initiated by HHI in 2010 and extending until at least 2014.

54. Through the "pre-buying" program(s), HHI purchased, in advance of each emissions standards change, engines built prior to the standards change in amounts sufficient to satisfy as much as two years of projected equipment production commencing after the standards change. HHI did so for the purpose of being able to continue to manufacture, and to import, offer for

sale, sell, and/or introduce or cause to be introduced into commerce in the United States, equipment containing those engines while evading the more stringent emissions standards.

55. HCEA imported and then offered for sale, sold, and/or introduced into commerce this equipment containing engines that were not compliant with current-year emissions standards or were not imported in compliance with the TPEM program.

56. HHI sold and/or introduced, or caused to be introduced, into commerce in the United States equipment containing each of these engines in violation of Section 203(a)(1) of the Act, 42 U.S.C. § 7522(a)(1), and 40 C.F.R. § 1068.101(a)(1).

57. HCEA imported and then offered for sale, sold, and/or introduced into commerce in the United States equipment containing each of these engines in violation of Section 203(a)(1) of the Act, 42 U.S.C. § 7522(a)(1), and 40 C.F.R. § 1068.101(a)(1).

58. In addition, under the regulations, Hyundai was allowed to qualify for the TPEM exemption based on a percent of its production allowance or a small volume allowance and also to choose either option for any particular power category.

59. Hyundai initially utilized the percent-of-production allowance for engines in the $130 \leq kW < 560$ power category, and the small-volume allowance for engines in the $56 \leq kW \leq 130$ power category.

60. Hyundai exceeded its exempted engine allowances beginning in 2013 for the $56 \leq kW < 130$ power category.

61. Hyundai exceeded its exempted engine allowances beginning in 2013 for the $130 \leq kW < 560$ kW power category.

62. Hyundai exceeded its exempted engine allowances again in 2014 for the $130 \leq kW < 560$ power category.

63.  In 2012, Hyundai also imported, sold, offered for sale, introduced into commerce, or caused any of the foregoing, equipment in the $130 \leq kW < 560$ power category that it has represented to EPA were exempt under the TPEM program, even though Hyundai had not complied with the TPEM requirements for that equipment.  Specifically, this equipment was imported before Hyundai had submitted notice to EPA of its intent to participate in the TPEM program and, upon information and belief, the engines in this equipment were not labelled as required by the TPEM regulations.

64.  Each of the engines that were imported in excess of the number permitted by the TPEM regulations, or otherwise not in compliance with the TPEM regulations, was neither covered by an EPA-issued certificate of conformity valid for the applicable model year nor otherwise exempt from the Act's certification requirement.

65.  HCEA then imported, sold, offered for sale, and/or introduced into commerce equipment containing these engines that were in excess of the number permitted by the TPEM regulations.

66.  HHI sold, introduced into commerce, or caused to be introduced into commerce, each of these engines in violation of Section 203(a)(1) of the Act, 42 U.S.C. § 7522(a)(1), and 40 C.F.R. § 1068.101(a)(1).

67.  HCEA imported and then offered for sale, sold, and/or introduced into commerce in the United States each of these engines in violation of Section 203(a)(1) of the Act, 42 U.S.C. § 7522(a)(1), and 40 C.F.R. § 1068.101(a)(1).

## CLAIM FOR RELIEF

68.  Paragraphs 1 through 67 are incorporated by reference.

69.   The importation, sale, offering for sale, introduction or delivery for introduction into commerce (or causing any of the foregoing) by HHI and HCEA of each piece of nonroad equipment with an engine that was not covered by a certificate of conformity or otherwise exempt constitutes a separate violation of Section 203(a)(1) of the Act, 42 U.S.C. § 7522(a)(1) and 40 C.F.R. § 1068.101(a)(1).

70.   HHI and HCEA are jointly and severally liable for civil penalties of up to $37,500 per engine for each violation of the Act identified in the preceding paragraph. 40 C.F.R. § 19.4.

**PRAYER FOR RELIEF**

Wherefore, the United States requests that this Court:

a.      Assess civil penalties against Defendants jointly and severally of up to $37,500 per engine/piece of equipment for each violation;

b.      Award the United States its costs in this action; and

c.      Grant such other relief as this Court deems just and proper.

Respectfully Submitted,

JEFFREY BOSSERT CLARK
Assistant Attorney General
Environment & Nat. Resources Div.

ERIC D. ALBERT
Trial Attorney
Environmental Enforcement Section
Environment & Nat. Resources Div.
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
202-514-2800
Eric.albert@usdoj.gov

OF COUNSEL:

PROVIDENCE SPINA
Attorney-Advisor
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW
Washington, DC 20460
spina.providence@epa.gov


MARK J. PALERMO
Attorney-Advisor
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW
Washington, DC 20460
palermo.mark@epa.gov